# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| SHERRI DORNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1805 (RBW) |
| | ) | |
| TIMOTHY GEITHNER, Secretary, | ) | |
| United States Department of the Treasury | ) | |
| | ) | |
| Defendant. | ) | |

_____

## MEMORANDUM OPINION

Plaintiff Sherri Dorns brings this action against Timothy Geithner, in his official capacity as Secretary of the Treasury,[1] under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17 (2006), asserting claims of discrimination, retaliation, and hostile work environment.[2]  Currently before the Court is the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  After carefully considering all of the party's pleadings, the defendant's motion, the plaintiff's opposition, and all memoranda of law and

---

[1] The plaintiff's complaint, filed October 17, 2006, names Henry M. Paulson, the Secretary for the Department of the Treasury at the time, as the defendant in this case.  The Court has substituted Secretary Geithner as the defendant in lieu of former Secretary Paulson pursuant to Federal Rule of Civil Procedure 25(d)(1).

[2] Although the plaintiff uses the phrases "intentional infliction of emotional distress," Complaint ("Compl.") ¶ 33, and "negligent infliction of emotional distress," id. ¶ 34, the Court assumes that the plaintiff did not intend to assert these torts as actionable claims.  The reason for this assumption is that (1) the plaintiff did not invoke the Court's supplemental jurisdiction, which would be necessary for this Court to exercise jurisdiction over these common law tort claims, id. ¶ 4; (2) the plaintiff did not assert separate claims for intentional and negligent infliction of emotional distress in her "Statement of Claims," id. ¶¶ 29-36; and (3) the plaintiff did not request damages for these claims in her "Prayer for Relief," id. ¶ 37.  Moreover, these claims would fail even if the plaintiff had asserted them because none of the defendant's actions come remotely close to the level necessary to successfully assert such claims.  See Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 808 (D.C. 2007) (requiring conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" for intentional infliction of emotional distress) (quoting Paul v. Howard Univ., 754 A.2d 297, 307-08 (D.C. 2000); District of Columbia v. McNeill, 613 A.2d 940, 942-43 (D.C. 1992) (requiring that a plaintiff either be in a zone of danger caused by the defendant's negligence or that the plaintiff be physically endangered for negligent infliction of emotional distress).

exhibits submitted with these filings,[3] and for the reasons set forth below, the Court concludes

that it must grant the defendant's motion.

## I. BACKGROUND

Viewing the facts in the light most favorable to the plaintiff, as the Court must, the facts

of the case are as follows.

The plaintiff is a black female who "has been employed as a Program Analyst[] [at] the

Bureau of Engraving and Printing . . . , first in the Office of Procurement, and then in the Product

Development Center." Compl. ¶ 9. "[I]n 1997, the [p]laintiff filed . . . [her] first . . . formal

complaint[]" with the defendant's Office of Equal Employment Opportunity and Diversity,

which was subsequently settled. Id. ¶ 8. She initiated contact with an Equal Employment

Opportunity ("EEO") Counselor about the current claims on August 28, 2002, Def.'s Stmt. of

Facts ¶ 23; Pl.'s Stmt. of Facts, Response to Defendant's Statement of Facts ("Resp. to Def.'s

Stmt. of Facts")[4] ¶ 23, and filed her second formal administrative complaint on October 9, 2002,

Compl. ¶ 8, amending this second complaint several times to include new allegations, Def.'s

Stmt. of Facts ¶ 23; Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 23. "[A] final agency

---

[3] In addition to the plaintiff's complaint and the defendant's motion for summary judgment ("Def.'s Mot."), the Court considered the following documents and attachments thereto in reaching its decision: (1) the defendant's Answer and Affirmative Defenses ("Answer"); (2) the defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Stmt. of Facts"); (3) the defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); (4) the plaintiff's Opposing Facts Which Show That There is a Genuine Dispute and Material Facts Omitted by Defendant ("Pl.'s Stmt. of Facts"); (5) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); (6) the defendant's Reply in Support of Defendant's Motion for Summary Judgment ("Def.'s Reply"); and (7) the defendant's Reply to Plaintiff's Opposition to Defendant's Statement of Material Facts and Response to Plaintiff's Counterstatement of Facts ("Def.'s Resp. to Pl.'s Stmt. of Facts").

[4] The plaintiff has filed her Opposing Facts Which Show That There is a Genuine Dispute and Material Facts Omitted by Defendant as one document but in two parts, each with separately numbered paragraphs. To avoid confusion when referring to the paragraph numbers of this document, the first part will be referred to as Plaintiff's Statement of Facts, Response to Defendant's Statement of Facts ("Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts"), and the second part will be referred to as Plaintiff's Statement of Facts, Plaintiff's Additional Facts ("Pl.'s Stmt. of Facts, Pl.'s Add'l Facts").

decision was issued [on the plaintiff's second complaint] on July 17, 2006." Compl. ¶ 8.

Although the defendant initially "admit[ted] that [the p]laintiff ha[d] exhausted her

administrative remedies," Answer ¶ 8, this Court subsequently issued an Order on February 19,

2010, granting the defendant's Motion to Amend Answer, thereby allowing the defendant to

deny the plaintiff's statement that she had exhausted her administrative remedies, February 19,

2010 Order at 4.

The events leading up to the filing of the second administrative complaint commenced

"[o]n February 15, 2001, [when the p]laintiff, who was expecting with her second child[,] . . .

submitted to her supervisors a five-month request to telecommute[,]" during which she proposed

working twenty hour per week. Compl. ¶ 11. Four days later, "[o]n February 19, . . . [the

p]laintiff's supervisor, Ted Strahan[,] asked [the p]laintiff to submit a list of proposed projects"

appropriate for "a telecommuting arrangement," which the plaintiff provided. Id. ¶ 12. The

plaintiff "selected projects based upon [the] recommendation[s] of the project managers . . . to

ensure that the project(s) selected would provide identifiable benefits to the Bureau." Id. "[The

Bureau of Engraving and Printing] had in place a telecommuting policy," Pl.'s Stmt. of Facts,

Pl.'s Add'l Facts ¶ 3, which instructed that the immediate supervisor, followed by the Office

Chief, Associate Director, and Associate Director for Management all "review, consider, and if

appropriate concur with the requests initiated by the subordinate supervisor," Pl.'s Stmt. of Facts,

Pl.'s Add'l Facts ¶¶ 7-9, but the "request is not sent forward to the next step if it is denied," id. ¶

16. The procedure followed concerning the plaintiff's request to telecommute did not conform

completely to the procedure outlined in the telecommuting policy manual. Id. ¶¶ 3-21. Mr.

Strahan first communicated the denial of the telecommuting request on March 19, stating that he

"felt that the proposed projects would not justify the number of hours [the p]laintiff was requesting to work from home." Compl. ¶ 13. The plaintiff asked for a review of this decision, id., and apparently submitted "a second request to telecommute [that] detailed which projects she would complete while working from home," Def.'s Stmt. of Facts ¶ 7, and "[o]n April 13, 2001 . . . received [an e-mail at home during her maternity leave in which] upper management again denied [the p]laintiff's request on the grounds that the Office of Administrative Services should perform the work" the plaintiff suggested for telecommuting.[5] Compl. ¶ 14. The defendant asserts that Carla Bangs (formerly Carla Kidwell), the Associate Director, denied this request, Def.'s Stmt. of Facts ¶ 8, but the plaintiff counters that Ms. Bangs nevertheless passed the request on to Joel Taub, the Associate Director for Management, at the next level up, who ultimately denied it, Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 8. Regardless of the exact procedure the Bureau of Engraving and Printing used, the end result was that the plaintiff's request to telecommute was denied, Def.'s Stmt. of Facts ¶ 6; Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 6, even though the defendant did not follow internal procedure precisely, see Def.'s Resp. to Pl.'s Stmt. of Facts ¶ 20 (admitting that when a first line supervisor did not approve of a telecommuting request, the request should not have moved on to the next supervisor).

The plaintiff alleges that "[t]he reasons given by management for denying [her] request were mere pretext because [the Bureau of Engraving and Printing] has allowed similarly-situated employees, not in employees race, to [tele]commute." Compl. ¶ 14; see also id. ¶ 16. However,

---

[5] The plaintiff and defendant dispute which date, March 19 or April 13, 2001, is the date when her telecommuting request was denied. Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 6. However, since August 28, 2001, the date that the plaintiff admits to having filed her complaint, id. ¶ 23, is more than forty five days after both March 19 and April 13, this dispute is immaterial.

the "[d]efendant denies that the [Bureau of Engraving and Printing] approved the telecommuting requests of white females within [the plaintiff's] directorate and with her supervisor."  Answer ¶ 16.  As further evidence of the Bureau's inconsistency, the plaintiff notes that one of the projects that the plaintiff had requested as a basis for telecommuting was ultimately assigned to someone in the plaintiff's office in July, 2002.  Compl. ¶ 15.

The second action about which the plaintiff complains concerns the alteration of her duties.  "When [the p]laintiff first joined the Securities Technology Institute . . . from the Office of Procurement, she was . . . responsible for . . . developing procurement strategies, generating new procurement alternatives, formulating, presenting[,] and justifying proposals, and coordinating studies performed by other internal components or contractors relating to U.S. currency printed by" the Bureau of Engraving and Printing.  Id. ¶ 17.  However, she was later "assigned to a project involving community outreach to the manufacturers of cash handling equipment, and she was no longer responsible for negotiating major acquisitions and investigating the feasibility of incorporating new technologies into new currency design."  Id. ¶ 18.  In short, the plaintiff claims that "[s]he was relegated to . . . clerical tasks."  Id.  She asserts that her "frequent requests to be given more meaningful jobs were denied without justification" and that as a result "it became impossible for [her] to be considered for promotional and growth opportunities."  Id. ¶ 19.  The shift in the plaintiff's duties appears to have taken place sometime between 1997 and 1999.  Def.'s Mem. at 3.  The defendant asserts that the plaintiff's duties changed because, although "[w]hen [the p]laintiff joined BEP in 1995, her duties were primarily procurement related[,] . . . . procurement needs decreased, due to contract amendments."  Def.'s Mem. at 3.

The plaintiff believed that her "supervisors [were] creat[ing] a hostile work environment, [and she] sought to escape [it] by requesting that she be transferred or detailed to another position and office where the skills she learned would enhance her marketability." Compl. ¶ 22. The "[p]laintiff approached her second line supervisor, Larry Felix, [on March 13, 2002,] regarding obtaining [such] a detail." Def.'s Stmt. of Facts ¶ 9; Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 9. However, "[o]n May 17, 2002, Mr. Felix sent the plaintiff an email informing her that she did not have enough experience for the places he had contacted on her behalf," Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 10, even though "[t]he plaintiff had spoken with other agencies who were willing to agree to details of up to six months." Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 25. Both parties generally agree that Mr. Felix "was not opposed to a 120-day detail," Def.'s Mem. at 4-5; Def.'s Stmt. of Facts ¶ 11; Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 25, but "that any specifics beyond a 120 day[] [detail] would have to be discussed with [the plaintiff's] immediate supervisor," Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 11. The plaintiff points to "[o]ther individuals . . . [who] had details of over a year," Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 26, although whether their initial detail was for that length or whether they had shorter details that were incrementally extended is unclear, Def.'s Resp. to Pl.'s Stmt. of Facts ¶ 26. Ultimately, the plaintiff did not receive a detail during the summer of 2002, and "[t]he program through which [she] went on a one-year detail . . . in 2004 did not exist" in 2002. Def.'s Stmt. of Facts ¶ 12; Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 12.

Additionally, the plaintiff, "who [had] always received outstanding performance reviews," Compl. ¶ 19, "was given a[] performance rating of '[A]chieved [S]tandards,'" id. ¶ 20, in November 2002. The defendant has consistently maintained that Ted "Strahan [also] rated the

other three Program Analysts [as having] 'Achieved Standards' for the same time period."

Def.'s Stmt. of Facts ¶ 14. The plaintiff asserts that since the "performance goals and her current

duties were unrelated" to the actual functions she performed, "and her supervisors had never

communicated [her] goals and objectives to her," the lower rating she received was unjustified.

Compl. ¶ 20. The plaintiff claims that "[m]anagement ignored [her] frequent and repeated

demands to provide her with performance standards," id. ¶ 21, although the defendant denies this

assertion, Answer ¶ 21. The plaintiff believes that the "lower rating was given . . . in retaliation

for having mad[e] and filed complaints of discrimination." Compl. ¶ 20.

After "filing her complaint in October, 2002, the Bureau of Engraving and Printing has[,

in the plaintiff's view,] denied [her] reasonable requests for training on the grounds that the

requested training was not related to [her] work and that there was no money in the training

budget." Id. ¶ 23. The specific courses that the plaintiff requested to take were for "Microsoft

Project 200[0]/Advanced Features, Government Business Case Development, Economics 405,

and Sociology." Def.'s Stmt. of Facts ¶ 17; Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶

17. "Mr. Strahan . . . believed that the Microsoft 200[0]/Advanced Feature was pivotal to [the]

plaintiff's assignment and approved the course." Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 34.

However, "Mr. Felix did not believe that [the four courses] were work related or would assist the

Agency in achieving its mission." Def.'s Stmt. of Facts ¶ 19; Pl.'s Stmt. of Facts, Resp. to Def.'s

Stmt. of Facts ¶ 19. The plaintiff asserts that "[t]hese reasons were false because . . . [all the

courses she requested] were . . . related to the [her] work, and there was money in the budget to

pay for these courses." Compl. ¶ 23. The plaintiff also alleges that the Bureau of Engraving and

Printing "willingly paid for courses for white employees and employees who had not filed

discrimination complaints," <u>id.</u>, but from 1996 until 2007, the plaintiff also attended forty one courses, Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 21.

Finally, on March 3, 2003, "because of a high blood pressure issue," Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 49, the plaintiff requested and "the defendant denied [her] request for [three] hours of advanced sick leave/leave without pay," <u>id.</u> ¶ 2. "As a result of the denial, the plaintiff was required to use [three] hours of compensatory time." <u>Id.</u> ¶ 38. The "[d]efendant alleges that the advanced sick leave was denied because the plaintiff did not provide evidence that she had a serious or incapacitating disability." <u>Id.</u> ¶ 39.

The plaintiff claims that the "continual and on-going discrimination was outrageous and was intended to cause and did cause [the p]laintiff to suffer physical harm and severe emotional distress." Compl. ¶ 33. This conduct allegedly required "doctor's care and [the plaintiff] continues to seek medical treatment for emotional illness." <u>Id.</u>

## II. STANDARD OF REVIEW

In order to grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006) (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150 (2000)). Additionally, the moving party must show that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

at trial." <u>Celotex Corp. v. Cartrett</u>, 477 U.S. 317, 322 (1986). In responding to the motion, the non-moving party cannot rely on "mere allegations or denials . . . , but . . . must set forth specific facts showing that there [are] genuine issue[s] for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (internal quotation and citation omitted) (second omission in original). In other words, the non-moving party cannot present "conclusory allegations unsupported by factual data [to] create a triable issue of fact." <u>Pub. Citizen Health Research Group v. FDA</u>, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal quotation and citation omitted). Thus, "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment is [appropriately] granted." <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted).

### III. LEGAL ANALYSIS

The defendant seeks summary judgment on the grounds that (1) the plaintiff failed to exhaust her administrative remedies with respect to two of her claims, (2) the plaintiff has not demonstrated that she suffered adverse employment actions, (3) even if the plaintiff did suffer an adverse action, the defendant has asserted a non-discriminatory reason for his actions and the plaintiff has failed to provide any evidence that the defendant's proffered reason is pretextual, (4) even if the plaintiff suffered an adverse action, no reasonable jury could conclude based on all the evidence that the defendant acted with a retaliatory motive, and (5) the conditions under which the plaintiff worked were not permeated with discriminatory intimidation, ridicule and insult, sufficient to constitute a hostile workplace. For the reasons set forth below, the Court concludes that the plaintiff failed to exhaust her administrative remedies with respect to those aspects of her claims related to the change of her duties and the denial of request to telecommute. Additionally, the Court concludes that the remaining components of the plaintiff's discrimination

and retaliation claims, specifically relating to the plaintiff's request to be detailed to a position outside the Bureau of Engraving and Printing, her performance evaluation of "Achieved Standards," the denial of her request to attend four training courses, and the denial of the plaintiff's request to take three hours of advanced sick leave or leave without pay, do not rise to the level of adverse employment actions under Title VII. Finally, the Court concludes that the plaintiff has not alleged facts sufficient to support a hostile workplace claim. Therefore, the defendant's motion for summary judgment is granted.

### A.     The Plaintiff's Discrimination and Retaliation Claims

Title VII claims are analyzed under the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), including claims of retaliation. Lathram v. Snow, 336 F.3d 1085, 1089 n.3 (D.C. Cir. 2003). Under this framework, a plaintiff must first establish a prima facie case, at which point the defendant must assert a non-discriminatory or non-retaliatory justification for its actions. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 n.3 (1993). However, when a defendant asserts a non-discriminatory reason for its actions, the "McDonnell Douglas framework – with all its presumptions and burdens – is no longer relevant," id. at 510, "and the sole remaining issue [is] discrimination vel non," Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983)). The District of Columbia Circuit recently clarified that indeed, "the question whether the employee made out a prima facie case is almost always irrelevant." Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008). And this is especially so at the summary judgment stage because by then "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision . . . ," rendering "whether the

employee actually made out a prima facie case . . . 'no longer relevant' . . . ." Id. (citing St. Mary's Honor Ctr., 509 U.S. at 510, 511 (1993); Reeves, 530 U.S. at 143. Thus, the only issue remaining when assessing a summary judgment motion is whether the plaintiff "create[d] a material dispute on the ultimate issue of [discrimination or] retaliation 'either directly by [showing] that a discriminatory [or retaliatory] reason more likely motivated the emloyer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (internal citation and quotaton omitted) (third alteration in original). In making this decision, this Court weighs all relevant evidence, including the plaintiff's prima facie case, evidence that the defendant's proffered reason is pretext, and any other relevant evidence. Id. at 679.

      **1.**    **Exhaustion of Plaintiff's Administrative Remedies With Respect to the Denial of Her Request to Telecommute and the Change in Her Duties.**

      To challenge an employment decision as discriminatory or retaliatory, federal employees must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). The plaintiff's telecommuting request was, according to the plaintiff, ultimately denied on April 13, 2001. Compl. ¶ 14. The plaintiff did not initiate her contact with an EEO Counselor until August 28, 2002, Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 23, more than sixteen months after her request to telecommute was denied, and she therefore failed to exhaust her administrative remedies as to this allegation, see Broderick v. Donaldson, 437 F.3d 1226, 1232-33 (D.C. Cir. 2006) (affirming the district court's grant of

summary judgment on two of the plaintiff's claim because her first two non-selections occurred years before she contacted an EEO Counselor).

Additionally, the plaintiff's allegations that she sustained an adverse change in her duties and "she was no longer assigned projects related to the acquisition of materials, establishing procurement strategies, or economic/program analysis," but instead was "relegated to . . . clerical tasks," Compl. ¶ 18, also cannot survive the defendant's exhaustion challenge. She claims that this shift in her duties took place when she was "assigned less substantial tasks [in] 1999,"[6] Pl.'s Opp'n at 33, and therefore, the events that gave rise to this claim took place three years before the plaintiff first contacted an EEO Counselor in 2002.

The plaintiff has two responses to the defendant's claim that she has failed to exhaust her administrative remedies with respect to these two personnel actions. First, she claims that failure to exhaust administrative remedies is an affirmative defense and that "an affirmative defense not raised by the answer cannot be raised in a dispositive motion that is filed post-answer." Pl.'s Opp'n at 14 (citing Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)). Second, she contends that the defendant should not be allowed to raise his exhaustion argument because he conceded it in his answer. Id. However, both of these arguments evaporate in light of the Court's issuance of its Supplemental Order granting the defendant's motion to amend his answer, which was granted because it was determined that "there is simply no evidence of bad faith or dilatory motive on the part of the defendant . . . [and] there is no indication that the plaintiff will suffer any undue prejudice if the Court grants the defendant leave to amend his

---

[6] The plaintiff's complaint implies that the shift in duties took place after she "returned from maternity leave and after she file[d] her original 1997 discrimination" claim, Compl. ¶ 18, but neither this date nor the 1999 date would place the alleged discriminatory or retaliatory conduct within the required forty-five day window.

answer."[7]  Supplemental Order Granting Def.'s Mot. to Amend Answer at 5.  Therefore, the

plaintiff having asserted no excuse for her failure to exhaust her administrative remedies, the

components of her discrimination claim based on the defendant's failure to grant her request to

telecommute and for changing her duties fail to survive his summary judgment motion.

### 2.  The Adverse Employment Actions Asserted by the Plaintiff.

Although this Court need not examine the plaintiff's prima facie case as a threshold

matter, Title VII nevertheless requires that the plaintiff suffered some adverse employment

action.  See Ginger v. District of Columbia, 527 F.3d 1340, 1343 (D.C. Cir. 2008) ("An

employment action does not support a claim of discrimination unless it has 'materially adverse

consequences . . . .'" (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  The

Supreme Court has described the concept of a "tangible employment action" as "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Thus, "[w]hile adverse employment

actions extend beyond readily quantifiable losses, not everything that makes an employee

unhappy is an actionable adverse action.  Minor and even trivial employment actions that 'an

irritable, chip-on-the-shoulder employee did not like would otherwise form the basis of a

---

[7]  The Court granted the defendant's Motion to Amend Answer on November 12, 2009, and required the defendant to file his Amended Answer by November 19, 2009.  Supplemental Order Granting Def.'s Mot. to Amend Answer at 5.  The defendant failed to amend his answer by that date and on December 11, 2009, the Court issued an Order requiring the defendant to show cause why the amended answer had not been filed as required.  See Show Cause Order.  The defendant filed his response to this Order on December 22, 2009 and, over the plaintiff's opposition, the Court allowed the defendant to file his amended answer.  February 19, 2010 Order at 4.  The amended answer asserts as an additional affirmative defense the plaintiff's failure to exhaust her administrative remedies.  Amended Answer ¶ 8.  Given the conflict between the parties regarding whether the defendant should be allowed to file the amended answer, it is important to note that the affirmative defense of failure to exhaust administrative remedies did not effect the outcome of this case, since the defendant identified non-pretextual rationales for the two alleged adverse employment actions about which the plaintiff failed to exhaust her administrative remedies, and no reasonable jury could find for the plaintiff.  See Part III.A.3, infra.

discrimination suit.'"  Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).

"An employment decision does not rise to the level of an actionable adverse action . . . unless there is a 'tangible change in the duties or working conditions constituting a material employment disadvantage.'"  Walker v. Wash. Metro. Area Transit Auth., 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (quoting Kilpatrick v. Riley, 98 F. Supp 2d 9, 21 (D.D.C. 2000) (emphasis added).  Thus, it is "clear that Title VII plaintiffs must demonstrate that an allegedly adverse personnel action had a tangible impact on the terms and conditions of a plaintiff's employment." Mack v. Strauss, 134 F. Supp. 2d 103, 112 (D.D.C. 2001) (citing Brown v. Brody, 199 F.3d 446, 454-55 (D.C. Cir. 1999)).  This requirement guards against "judicial micromanagement of business practices," Mungin v. Katten, Muchin & Zavis, 116 F.3d 1549, 1556 (D.C. Cir. 1997) and "frivolous suits over insignificant slights," Russell, 257 F.3d at 818.

In the retaliation context, an adverse action is one that is "harmful to the point that [the employer's action] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  Thus, this standard "involve[s] something short of what would ordinarily be considered a 'personnel action' (e.g., denial of promotion, discharge, salary reduction)," Rattigan v. Gonzales, 503 F. Supp. 2d 56, 75 (D.D.C. 2007), and is therefore "more lenient," Sewell v. Chao, 532 F. Supp. 2d 126, 136 (D.D.C. 2008).  However, "[a]ctionable retaliation claims are [still] limited to those where an employer causes 'material adversity,' not 'trivial harms.'"  Wiley v. Glassman, 511 F.3d 151, 161 (D.C. Cir. 2007) (quoting Burlington N., 548 U.S. at 68) (emphasis in original).

Under either the standard for claims of discrimination or retaliation, none of the allegations asserted by the plaintiff in support of her remaining claims rise to the level of adverse actions.

In March, 2002, the plaintiff requested a detail outside the Bureau of Engraving and Printing. Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 24. Generally, a lateral transfer or the denial of such a transfer, without "some other adverse change in the terms, conditions or privileges of employment," does not amount to an adverse action. Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (citing Brown, 199 F.3d at 457). Thus, denial of a detail may constitute an adverse action only if the denial also "entailed materially adverse 'consequences affecting the terms, conditions, or privileges' of [the plaintiff's] employment." Roebuck v. Washington, 408 F.3d 790, 794 (D.C. Cir. 2005) (quoting Brown, 199 F.3d at 457). In this case, the defendant asserts that he did not deny the plaintiff's request. Def.'s Mem. at 17. Indeed, the plaintiff essentailly agrees, stating that she wanted a longer detail of six months to one year, but the defendant was only willing to grant an initial 120 day detail, "with a decision on a longer period made by the plaintiff's immediate supervisor in consultation with[] [Bureau of Engraving and Printing] management." Pl.'s Opp'n at 20. Thus, the parties agree that the defendant was open to awarding the plaintiff a detail, just not for the initial length of time the plaintiff desired. Since the longest detail that the plaintiff was able to identify was for six months, id., in order to constitute an adverse action, the plaintiff would have to show that a 120 detail was insufficient to enhance her future employment opportunities, whereas a six month detail would have done so.

Moreover, even if the plaintiff could demonstrate a denial of her request for a detail, she has not demonstrated that the denial affected the terms, conditions, or privileges of her employment. It is true that the plaintiff alleged that a detail was necessary "because in her

current position and duties, she had no growth potential or promotion potential." Id. However, simply stating that such a transfer would have provided growth potential does not establish an adverse action. See Maramark v. Spellings, No. 06-5099, 2007 WL 2935411, at *1 (D.C. Cir. Sept. 20, 2007) (holding that a plaintiff's hope of securing a permanent position at another agency is "too speculative" to constitute an adverse employment action); Brookens v. Solis, 616 F. Supp. 2d 81, 91 (D.D.C. 2009) (concluding that the plaintiff's assertion, unsupported by additional facts, that a detail would have "provided him training, experience and promotional advancement opportunities" were "vague and speculative assertions" that did not rise to the level of an adverse action).

The plaintiff's challenge to her performance review of "Achieved Standards" similarly fails to constitute an adverse action. There is a "thick body of precedent [that] . . . refutes the notion that formal criticism or poor performance evaluations are necessarily adverse actions." Brown, 199 F.3d at 458. Courts have consistently held that where there is no change in benefits, or the performance rating was not tied to an employee's bonus, a negative or decreased performance rating is not an adverse action. See Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007) (determining that to accurately assess whether the plaintiff's lower performance evaluation was an adverse action, the district court needed to assess whether the evaluation resulted in her non-receipt of performance awards); Powell v. Castaneda, 390 F. Supp. 2d 1, 11 (D.D.C. 2005) (holding that a "Fully Satisfactory" rating did not constitute a change in employment status). Only when an employment rating is tied to a bonus or some other tangible benefit will a lower rating constitute an adverse action. See Russell, 257 F.3d at 819 (holding that to the extent the plaintiff's "exceptional" rating, one rating below the highest, cost her a higher bonus, the

plaintiff had demonstrated an adverse action and therefore summary judgment was premature). In this case, the plaintiff has not shown that her rating of achieved standards affected her "salary, bonus, grade, or any other term or condition of [her] employment," and she therefore has not shown that she suffered any adverse employment action resulting from the rating. See Brown v. Paulson, 597 F. Supp. 2d 67, 74 (D.D.C. 2009) (dismissing a plaintiff's claim who had received a rating of "Achieved Standards" and had not countered the defendant's evidence that it had no tangible effect).

The plaintiff also asserts that the defendant's refusal to allow her to attend four training courses amounted to an adverse personnel action. Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶¶ 34-37. As with a denial of detail, denial of training opportunities is only actionable if there is a resultant "material change in . . . employment conditions, status, or benefits." Lester v. Natsios, 290 F. Supp. 2d 11, 29 (D.D.C. 2003). While the "denial of training may rise to the level of an adverse employment action," Freedman v. MCI Telecomm'n Corp., 255 F.3d 840, 845 (D.C. Cir. 2001), the denial must "result[] in a tangible harm," Everson v. Medlantic Healthcare Group, 414 F. Supp. 2d 77, 84 (D.D.C. 2006). Just as is the case with the plaintiff's claim concerning her request for a detail, here too the plaintiff has failed to demonstrate that the denial of her training request produced any adverse consequences in her employment status, conditions, or benefits, and therefore this component of her discrimination and retaliation claims fails.

The final adverse action the plaintiff asserts is the denial of three hours of advanced sick leave she requested on March 23, 2003. However, even assuming that the denial of advanced sick leave is actionable, the amount in question here is too de minimis to be considered "material" or "significant." See Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)

(recognizing that it would be "absurd to . . . attribute[] to . . . Congress" the intent to make Title VII "actionable [to] insignificant disparities in the treatment of employees of different races"); Hussain v. Principi, 344 F. Supp. 2d 86, 104 (D.D.C. 2004) (finding that intentionally delaying the forwarding of a letter, refusing to allow the plaintiff's counsel to ask questions during a meeting concerning retirement options, and denial of access to official personnel files were all too de minimis to constitute adverse actions). Therefore, the defendant's refusal to exercise his discretionary authority to allow the plaintiff to use her advanced sick leave was not an adverse action.

Although a series of independent actions, none of which are adverse actions standing alone, may constitute an adverse action collectively, there is no "bright line rule" for determining when such impact has occurred. Baloch v. Norton, 517 F. Supp. 2d 345, 363 (D.D.C. 2007). Instead, "courts must exercise their judgment carefully on a case-by-case basis. Id. (citing Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997). In this case, the plaintiff has not demonstrated that each individual frustration, even when considered collectively, resulted in an aggregate adverse employment action. See Brodetski v. Duffey, 199 F.R.D. 14, 21 (D.D.C. 2001) (determining that a series of supposed affronts including an insulting memorandum, misallocating responsibilities so that the plaintiff felt as though he was doing more work than others, and assigning him to work the news desk alone for four hours did not, even in the aggregate, constitute adverse action).

### 3. The Defendant's Proffered Justifications for the Challenged Actions.

In addition to the plaintiff's failure to exhaust her administrative remedies or allege an adverse employment action, she has also failed to counter the defendant's proffered, non-

discriminatory justification for each of his actions.  Therefore, even if any of the alleged actions that the plaintiff points to were considered adverse actions, no reasonable jury could find that it was more likely than not that the defendant discriminated or retaliated against the plaintiff as she contends.  See Brady, 520 F.3d at 494 (directing courts to look at the central question of whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer intentionally discriminated [or retaliated] against the employee").  Addressing the plaintiff's shift in duties, the defendant explains that after 1997 "procurement needs decreased, due to contract amendments."  Def.'s Mem. at 3.  With respect to the defendant's decision not to allow the plaintiff to telecommute, the defendant articulated to the plaintiff both that "the proposed projects would not justify the number of hours [she] was requesting to work from home," Compl. ¶ 13, and that "the Office of Administrative Services should perform the work" she proposed to do, id. ¶ 14.  True, the plaintiff correctly notes that the project she originally applied for was eventually "assigned to a white employee within [the p]laintiff's office," in July, 2002, id. ¶ 15, but this does not address the defendant's first rationale for the denial of the request to telecommute, and this assignment occurred more than a year later, when any number of intervening decisions could have placed the work within the purview of a different department. With regard to the procedural flaw in the telecommuting approval process, the plaintiff argues that "[i]n reviewing [the plaintiff's] request, the process should have ended if the first line supervisor did not approve the request."  Pl.'s Stmt. of Facts, Pl.'s Add'l Facts ¶ 20.  However, part of this departure from protocol can be explained by the fact that "Ms. [Bangs, the Associate Director of Technology,] had a personal policy against telecommuting and that all requests would go to Mr. Taub[, the Associate Director for Management]."  Id. ¶ 21.  Thus, challenging

the propriety of this administrative error does not enhance the plaintiff's position that the defendant's asserted justification is not credible.

Regarding the failure to detail the plaintiff to another assignment, the defendant explains that Mr. Felix could not find a suitable match for the plaintiff given her experience. Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 10. As to the plaintiff's complaint about receiving an "Achieved Standards" performance review, the defendant explains that she received that rating "because, in [Mr. Strahan's] opinion, she performed her duties in a satisfactory manner." Def.'s Mem. at 23. And, the plaintiff has produced no evidence beyond her own subjective opinion that she performed at a higher level, and merely argues that she did not have an opportunity to tailor her performance appropriately because she was working under an outdated performance plan. Compl. ¶ 20; see Waterhouse v. District of Columbia, 124 F. Supp. 2d 1, 7 (D.D.C. 2000) (noting that the "plaintiff's perception of himself, and of his work performance, is not relevant. It is the perception of the decisionmaker which is relevant"), aff'd 298 F.3d 989 (D.C. Cir. 2002). As far as the four training courses are concerned, the defendant notes that he was unable to authorize them because there was insufficient money available in the budget. Id. ¶ 23. Other than the plaintiff's bald assertions that the courses were related to her job and that there was money available in the budget, id., she has done nothing to rebut the defendant's justification, see Barbour v. Browner, 181 F.3d 1342, 1347 (D.C. Cir. 1999) (dismissing a plaintiff's claim because she presented "nothing to buttress her evidence of pretext"). Finally, the defendant reasons that the plaintiff's request for advanced sick leave could not be granted because she "did not provide evidence that she had a serious or incapacitating disability." Pl.'s Stmt. of Facts, Resp. to Def.'s Stmt. of Facts ¶ 48. Requiring such proof is not unreasonable, and as the

defendant aptly notes, approval of the plaintiff's request is necessary to ensure that advanced sick leave is not approved too frequently, and the plaintiff's alternative request to take leave without pay was denied in the "discretion of management" because approving such a request "would undermine a supervisor's ability to prevent unexcused absences from work." Def's Mem. at 6. The defendant has, therefore, articulated non-discriminatory reasons for each of the actions challenged by the plaintiff, and given the lack of any evidence undermining these reasons, no reasonable jury could find that the defendant acted with a discriminatory or retaliatory motive as to any of them.

**B.      The Plaintiff's Hostile Workplace Claim**

A hostile workplace exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule and insult,' that is 'sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., 510 U.S. 17, 21 (1993). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Id. In evaluating hostile or abusive work environment claims, courts assess "the frequency of discriminatory [or retaliatory] conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. To establish the prima facie case of her hostile workplace claim, the plaintiff must demonstrate that "(1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or

should have known about the harassment, but nonetheless failed to take steps to prevent it."

Hendricks v. Paulson, 520 F. Supp. 2d 65, 89 (D.D.C. 2007).

The plaintiff has clearly failed to allege facts that rise to the level of a hostile workplace claim. See Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (agreeing with the district court's finding that the "sporadic nature of the conflicts," and lack of any evidence of comments or actions "directed at [the plaintiff] . . . focus[ing] on his race, religion, age, or disability" did not create "conflicts [that] were . . . so 'severe' or 'pervasive' as to have changed the conditions of [the plaintiff's] employment" and did "not rise to the level necessary to support a hostile work environment claim").  In Pearsall v. Holder, 610 F. Supp. 2d 87 (D.D.C. 2009), the plaintiff argued that the Department of Justice created a hostile workplace when it assigned him to an inferior office, denied him training, did not allow him to telecommute on a temporary basis for medical reasons, excluded him from some meetings, and generally underutilized his skills and experience, id. at 98 n.10.  The Pearsall court summarily dismissed the plaintiff's hostile work enivornment claim, finding that "[t]he indignities [the plaintiff] identifie[d] simply d[id] not meet [the] standard [necessary to establish the claim,] . . . . [as] they [were] 'ordinary tribulations of the workplace' which fall outside the purview of Title VII."  Id. at 99 (quoting Rattigan, 503 F. Supp. 2d at 73)).  Here, the tribulations about which the plaintiff complains bear striking similarities to the ones dismissed in Pearsall, and she, too, has failed to demonstrate that she was subjected to a pervasively abusive or hostile work environment.  Therefore, the defendant must also be awarded summary judgment on this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff has failed to demonstrate that a reasonable jury could conclude that it was more likely than not that the defendant discriminated or retaliated against her.  She also failed to exhaust her remedies with respect to two components of her claims, specifically, the challenges to the change of her duties and the denial of her request to telecommute.  The other four components of the plaintiff's discrimination and retaliation claims, namely, the failure to detail her to a position outside the Bureau of Engraving and Printing, her decreased performance rating, the denial of her training requests, and her forced use of compensatory time rather than granting her requests to take advanced sick leave or leave without pay, also fail because she has not demonstrated that she sustained an adverse employment action based either on the individual acts of the defendant or in the aggregate.  Moreover, even if these shortcomings in the plaintiff's proof did not exist, the defendant has provided legitimate, nondiscriminatory explanations for each of the challenged actions, and because a jury would be lacking any evidence demonstrating that the defendant's explanations are pretextual, no reasonable jury could conclude that it was more likely than not that the defendant actually discriminated or retaliated against the plaintiff.  Finally, the plaintiff has not demonstrated that she was subjected to a hostile work environment, and therefore this component of her claims, as well as all other aspects of the claims, cannot survive the defendant's summary judgment motion.

**SO ORDERED** this 12th day of March, 2010.[8]

REGGIE B. WALTON
United States District Judge

---

[8] An order will be entered contemporaneously with this memorandum opinion granting the defendant's motion for summary judgment and closing this case.